# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## MOSBY'S EX'OR v. JOHNSON'S ADM'R.

### DECEMBER 13th, 1889.

TRUSTEES—*Liability.*—Sale under trust deed to secure a debt was declared invalid long after it was made, and trustee's representatives were adjudged to pay into court the value of the land when sold, with interest. The debt was then paid from the trustee's estate; but the amount paid was less than the land's value, with interest. *Held,* trustee's representatives must pay into court, for benefit of debtor's estate, the difference.

Appeal from decree of the circuit court of Lynchburg, rendered June 28, 1888, in the cause of Moorman against Johnson and Kean, Receiver, against Mosby's Executor. The decree being adverse to Mosby's executor, he appealed. Opinion states the case.

*E. S. Brown,* for the appellant.

*W. W. Larkin* and *Staples & Munford,* for the appellees.

LEWIS, P., delivered the opinion of the court.

This case is as follows: On the 17th of February, 1854, George T. Johnson, being indebted to Charles H. Moorman in the sum of $5,620 70, evidenced by bond, executed a deed of trust, in which his wife united, whereby he conveyed to Charles L. Mosby and John M. Speed, trustees, five lots in the city of Lynchburg, and a tract of land in Campbell county, to secure the payment of the

said bond.   On the 15th of December, 1862, Johnson having in the meantime died, the trustees sold at public auction one of the lots, designated in the record as the Main street lot, to Solomon Levi, for $9,840.   The purchase money was paid in Confederate currency, and the trustees conveyed the lot to the purchaser.   Moorman, however, refused to take Confederate money from the trustees, and thereupon they deposited the proceeds of sale in one of the Lynchburg banks for Moorman, if he would take the Confederate money—if not, for the widow and heirs of Johnson.   The money so deposited remained in the bank until the close of the late war, when the bank went into liquidation.   A dividend on the deposit, amounting to $572 49, was subsequently paid through Mosby to Moorman.

In May, 1878, Moorman filed his bill in the court below against the administrator and heirs-at-law of Johnson, Solomon Levi and Charles L. Mosby, surviving trustee, and the administrator of John M. Speed, deceased, alleging that a large balance on the debt due by Johnson's estate remained unpaid, and praying a decree for its payment.   When the cause came on to be heard, the circuit court held that the sale by the trustees of the Main street lot was made without authority, and ordered an account to be taken to ascertain its "true intrinsic value in good money, on the 15th of December, 1862."   The commissioner who made the inquiry reported that its value at that time, in a sound currency, was $7,000. And thereupon it was decreed that the executor of Mosby, who in the meantime had died, and the administrator of Speed, pay to the credit of the cause, from the assets of the estates of their decedents, *the sum of* $7,000, *with interest thereon from the 15th of December,* 1862, *until paid, subject to a credit of* $572 49, *the amount of the dividend above mentioned.*   Upon appeal to this court, this decree was affirmed by an equally divided court, on the 16th of April, 1885.

After the case went back to the circuit court, the Moorman

debt was fully paid out of the proceeds of the sales of lands belonging to Mosby's estate, but the amount of the debt so paid was $720 75 less than the ascertained value of the Main street lot, with interest, and accordingly that sum—namely, $720 75—the executor of Mosby was ordered to bring into court (it being admitted by all parties that the estate of Speed is insolvent) by the decree now complained of.

We are of opinion that there is no error in the decree. The principles of the cause were settled by the decree which was affirmed on the former appeal, and the subsequent action of the court below was in conformity with those principles. By the decree first appealed from, it was decided that the sale of the Main street lot by the trustees was without authority, and, consequently, that the trustees, or their representatives, were liable for the value of the lot, which was ascertained to be $7,000, and that sum to bear interest from the 15th of December, 1862, subject to a credit of $572 49, as aforesaid. In other words, it was held, in effect, that the representatives must restore to the fund that amount of money, to represent or take the place of the lot just mentioned—and this decree was in all respects affirmed.

Whether that decision was right or wrong, is a question not now open for consideration. It is enough to say that the decree was affirmed, and although affirmed by an equally divided court, the effect of the decree of affirmance is the same, so far as the present appeal is concerned, as if the voice of the court had been unanimous for the same result. *Campbell* v. *Campbell*, 22 Gratt., 649; *Woodson's Ex'or* v. *Leyburn*, 83 Va., 843.

It is true nothing was said in the decree about the representatives of the deceased trustees paying anything to the Johnson heirs, nor is there any allegation in the pleadings of any liability on the part of the former to the latter. But that does not affect the case. The liability of the trustees, as declared and ascertained by the decree which was affirmed, was, as between them and the Johnson heirs, intended, as we have

said, to stand in the place of the Main street lot; so that, as between those parties, the case stood, when it was remanded to the lower court, as though the lot had been regularly sold and the proceeds of sale brought into court. This, we think, is clear, and viewing the case in this light, the solution of the question presented by this appeal is free from difficulty.

If, then, there had been no sale by the trustees, and if the lot had been sold under a decree of the court, and the purchase money brought under the control of the court, what would have been the rights of the parties? Clearly the Moorman debt would have been first payable out of the proceeds, and the surplus, if any, would have gone to the representatives of Johnson, the grantor in the deed of trust. Then if the representatives of the trustees must bring into court the equivalent in money of the lot, as of the 15th of December, 1862, with interest from that date, as they have been decreed to do, and the fund so brought in is more than sufficient to pay the Moorman debt, to whom ought the excess to be paid? Clearly to Johnson's representatives, because that excess represents the interest left in the grantor after the debt is paid.

It is true the full amount ordered to be brought in has not yet been paid into court, but only so much as was necessary to pay the Moorman debt. But this only shows that the decree which was affirmed has not yet been fully carried into execution, and that it was therefore proper for the court below to order, as by the decrees now complained of, it did order, that the residue of the fund—namely, $720 75—should be paid into court. What is to be the ultimate disposition of the money, after it shall have been paid into court, is only inferentially indicated in the decree, but as the order was made on the motion of the Johnson heirs, the case has been argued as if the money had been ordered to be paid to them, and accordingly much was said in the argument at the bar as to their right to a decree, inasmuch as no such issue is specifically raised in the pleadings.

Assuming, as there is no other claimant to the money ordered to be paid into court, that they are entitled to it, the point made by the appellant as to the pleadings, is without merit, for when the money is paid into court it will belong to those persons to whom it would be payable if it were in fact a surplus of the proceeds of an actual sale of the lot after payment of the Moorman debt, and may, therefore, be summarily disposed of on motion.

The decree is clearly right, and must be affirmed.

LACY, J., dissenting said:

This is an appeal from a decree of the circuit court of Lynchburg, rendered on the 28th of June, 1888, and is a second appeal in the case which was first held at the March term, 1885, under the style of *Mosby's ex'or* v. *Moorman's Adm'r and others.* On the first appeal, the decree of the said court rendered on the 19th day of May, 1881, was affirmed by an evenly divided court.

At that hearing I filed my opinion in the case as follows :

" On the 17th day of February, 1854, George T. Johnson and his wife, Zelinda S. Johnson, conveyed certain real estate to Charles L. Mosby and John M. Speed, situated in the city of Lynchburg, and county of Campbell, in trust to secure the payment to Charles H. Moorman the bond of the said Johnson for $5,620 70, dated January, 1st, 1854, and payable on demand.

" The said real estate consisted of five lots in the city of Lynchburg, and a tract of land in the county of Campbell, and was more than sufficient to pay off the debt secured. All the parties except Moorman resided in the city of Lynchburg, and he lived just outside the city limits about a mile or so, and was often in the city. Johnson made several payments on the bond, but died in 1862, leaving the bond unpaid in great

part, and his wife qualified as his administratrix. The said Johnson left six children surviving him, one being an infant.

"In 1862, Mrs. Johnson not being possessed of sufficient personal estate to pay the debt due to Moorman, and being desirous of settling up the estate of her husband, she and the heirs of Johnson called upon Mr. Speed and requested that the trustees would sell enough of the real estate to pay off this debt to Moorman. Whereupon Messrs. Mosby and Speed advertised the real estate in the deed mentioned in the city newspaper to which Moorman was a subscriber, setting out in the advertisement that the sale was contemplated to pay the debt due Moorman, and was to be made at the request of the heirs of Johnson. At the first offering there was no sale made. No price was offered with which the Johnson's were satisfied, and it was taken in. Shortly after another advertisement was published, setting forth that there would *be the sale of one lot* only out of the five conveyed, and that at the request of the legal representatives of George T. Johnson, dec'd, the sale would be made, and that the trustees were requested to state that the sale would be *peremptory*. Only *one lot to be sold*, and the sale of that *to be peremptory*. At this sale the advertisement was read in full by the auctioneer, at which sale one of the *adult* sons of George T. Johnson was present. At this sale Solomon Levi became the purchaser of this lot at the price of $9,840. This was December, 1862. He paid the purchase price, and the trustees made him a deed, reciting that by direction of the parties they had sold, but conveyed only as trustees, &c.

"Soon after, the first time Mr. Mosby met Mr. Moorman, who was his standing client (Mr. Speed being at the state capital, as a representative,), Mr. Mosby attempted to pay him his debt against the Johnsons and take in the bond of George T. Johnson. But Moorman refused to be paid—declined to receive confederate money. Mr. Mosby says this surprised him very much, that he had never before heard of anybody

who had refused to receive this money, then in universal use and general circulation. The date of this tender and refusal is not discoverable from the record, but is stated to be soon after the sale. The Johnsons were now notified of this unexpected turn in affairs, and so was the purchaser, Mr. Solomon Levi. Upon consultation, Mr. Mosby advised a chancery suit to arrange the matter in some safe way. Mr. Solomon Levi declared his wish to be off with the bargain, to give up the possession of the lot which had been surrendered to him by the Johnsons, and to have back his money, which he could use otherwise to his own satisfaction.

" The Johnsons insisted that the sale was a good one for them, and they intended to hold Mr. Solomon Levi to the bargain. In this state of affairs, the Johnsons replying to Mr. Mosby's advice as to a chancery suit, employed Mr. John O. L. Goggin, a lawyer in Lynchburg, to represent them, and he, *after some delay*, Mr. Mosby says, directed him to deposit the money in a savings bank, which was done May, 1863, to the credit of Charles H. Moorman if he would take it, and if not, for the Johnsons, and so the matter was settled then. The purchaser, Mr. Solomon Levi, kept the land, the Johnsons kept the money, in a sort of perpetual tender in the savings bank subject to Moorman's order. The result of the war broke the bank, it went into liquidation, and something was paid to depositors, and on this deposit $572 49 was paid to Moorman.

" In 1878, Mr. Speed having before that died, Moorman instituted his suit to subject the residue of this real estate to pay the debt secured by the deed, and convened all the parties mentioned above, except Mrs. Johnson and Mr. Speed, who were dead, Mr. Speed's personal representative and the new administrator of George T. Johnson, H. Hughs. Mr. Mosby answered, and gave the history of this sale, as far as he was concerned. The Johnsons also answered, acknowledging the sale; that default had been made in the payment of the debt; disclaim-

ing any knowledge as to whether Moorman had given any order or request for the sale (which was one of the provisions of the deed) and *denying that the heirs of George T. Johnson had any power to alter the terms of the deed.* Mr. Mosby soon after died, and on the 2d of April, 1879, the cause was revived against his executor, the appellant here. Soon afterwards, on the — day of ——, 1879, the Johnsons filed a cross-bill in the cause. In this bill they say: " *Your orators and oratrix aver that they, nor any of them, ever requested said sale to be made by the said trustees.*"

" Mosby's executor adopted Mr. Mosby's answer as his answer to this bill; Solomon Levi answered; depositions were taken in the cause, and on the 18th day of May, 1880, the circuit court of Lynchburg held, by decree that day entered, that the sale by Mosby and Speed, trustees, on the 15th of December, 1862, was without proper authority from the plaintiff, Moorman, and from *some of the Johnson heirs;* and that Mosby and Speed should be first held liable for the value of the property sold to Levi, before the other property conveyed in the deed or the lot sold to Levi should be subjected, and referred the enquiry to a commissioner as to what was the value of the lot in good money on the 15th day of December, 1862.

" The commissioner reported the value of the lot on the 15th of December, 1862, at $7,000. The circuit court, by decree entered in the cause on the 19th day of May, 1881, decreed this sum against the personal representatives of Mosby and Speed, with interest from December 15th, 1862. Whereupon Mosby's executor appealed to this court.

" It is too late to deny, in this state, that Moorman could refuse to receive Confederate money if he chose to do so; and it must be taken as a *concessum* that so much of his debt as remains unpaid, is still due to him notwithstanding the tender of the Confederate money. It is equally true that the trustees in a deed could not sell under the deed until so requested by the parties in interest. If requested to sell by the creditors, against the wishes of the debtors, they could bind the debtors only by a compliance

with the deed of trust terms—and a court of equity, at the suit of the debtors, would have so restrained the trustees to a compliance with the terms of the deed, as the agreement of the parties upon the subject and the chart of their power. But in this case the debtors did not set up at the time, nor afterwards for sixteen years after the sale, any objection to the manner or the terms upon which the land was sold, and not until suit was brought by the creditor to sell the unaliened lands conveyed by the deed and not sold by the trustees, although the creditors at the time promptly refused to permit the proceeds of the sale to be applied to the debt secured—of which the debtors had *immediate notice*—and although the purchaser promptly offered to be off with the bargain, give up the land and receive back the money which could not be applied to the debt secured by the deed. If the money was refused by the creditor and requested back by the purchaser, and was placed, by order of the debtors, in bank, subject to the order of the creditor, if he would take it, and if not, to their order, why was not this a payment to them of the money, and binding on them, as between them and the creditors, and as between them and the purchaser, and as between them and the trustees—indeed, as between them and all parties concerned? As between them and the purchaser, because they could not keep his money and withhold from him their land, for which the money was paid; as between them and the creditor, because it was their debt to him, and the tender was not an extinguishment of the debt; as between them and the trustees, because the payment to their order was a payment to them, and they could *demand* and *accept* payment of the money but once.

"The trustees were the agents of both the creditor and the debtor. The creditor was entitled to demand payment of the debt, and in default to subject the property to the satisfaction of the debt. The debtors had the right to pay the debt, and release the lien on their property. They had the right to have the deed executed and the debt paid, and the sur-

plus, whether in money or in unaliened property, was theirs. The personal representative of George T. Johnson, the debtor, had no other assets out of which the debt could be paid. *More property was encumbered by the deed than was necessary to pay the debt.* The obligation of the debtor was to pay the debt. The right of the creditor was to subject only so much of the property as was necessary to carry out this obligation to pay on the one side, and this right to demand payment on the other side. If the debtors requested the action of the trustees to that end, and it was had to that end only, was not this act, done by their own request, their act, and if their own act can they complain of it because, in an unexpected and heretofore unheard of way, it proved disastrous? Ought they to be heard to complain of their own agents, acting under their own direction, in accordance with their directions?

" We have said they cannot bind the creditor against his rights, without his consent, but cannot they bind themselves? They did not act unadvisedly, not under any mistake, because, as we have seen, if they were mistaken in believing that the creditor would take the money and have it applied in accordance with the terms of the trust to the extinguishment of their debt to him, they quickly had abundant proof of that mistake, and they then had the opportunity to retrieve their first mistake by using this money to extinguish the obligation they had unadvisedly incurred by delivering up the property to the purchaser, who was entirely willing to receive back his money and surrender the land he had bought under their and his mistaken belief that the proceeds of the sale, ample for the purpose, could be applied to the extinguishment of the lien thereon by the payment of the debt secured. But the Johnsons deny in their cross bill that they, or any of them, ever requested the trustees to sell this land. But this denial was not made until after the death of both the trustees. In their answer to Moorman's bill, they deny that *they had the power to alter the terms of the deed.* This answer was filed during the lifetime of Mr.

Mosby, and the bill was filed shortly afterwards, within a year, Mr. Mosby having died in the interval. In both the answer and the bill they are speaking of an event which occurred more than sixteeen years ago. The answer spoke at a point of time nearer to the event, and before Mr. Mosby's answer. The bill was filed after Mr. Mosby had answered and disclosed his evidence preserved, and after his death, and both appear to have been drawn by the same counsel. But the advertisement was exhibited with the answer of Mr. Mosby, and in that it is recited by Messrs. Mosby and Speed, *all parties then living,* that the sale *was at the request of the Johnson heirs, who desired to pay the debt secured by the deed.* This was in 1862. They then knew whether they requested it or not, and whether they were insisting on their right to pay the debt with the proceeds of one lot, and retain the other four lots and the tract of land in the county, conveyed to secure the debt to Moorman, free of the incumbrance, and when the sale was objected to by them for want of adequacy of price, and a new advertisement published for the sale of one lot, and setting forth that the trustees were requested to say, by them, that the sale would be peremptory, and the sale was made of property in their possession, which they voluntarily surrendered to the purchaser, they *might fairly be presumed* to know then how much of all this was true, or how much was false. But no presumption is necessary; it is proved, and not denied, that one of them was actually present attending the sale, aiding in its consummation, and that the terms of the advertisement were publicly read in his hearing. But without any of this, the fact remains undenied that Moorman refused *at once* to receive this money and to apply it to the debt; that they were promptly notified of this refusal; that they then employed counsel to advise them and to protect their interest. Now, then, let them explain why, if they had no part or parcel in this difficulty, had not made the sale, nor ordered nor requested it, their counsel did not then advise them, if such

be the fact, you are in no trouble; keep your lot; the purchaser can get no title. This was a special, a limited, a definite trust, to a single and distinctly designated end; the payment of a debt specifically designated, the purchaser must see to the application of this purchase money—return the money to Mr. Solomon Levi; keep your lot. Somebody seems to have so advised Mr. Solomon Levi, for he offers to cancel this sale, receive back his money, give up the lot, and abandon the purchase.

"Mr. Solomon Levi tells us distinctly 'he offered to reconvey the property and cancel the trade, *but the Johnson heirs were the* VERY PARTIES WHO INSISTED *upon holding him to it and having* the *money deposited in bank.'* It is true also that Mr. Solomon Levi says that the trustees at the same time informed him that the sale was made at the instance and request of Moorman and the Johnson heirs; and this as to him is denied by Moorman, but there was no denial on this point by Moorman or anybody else until Mr. Speed was dead, and Mr. Speed was the trustee who initiated the proceedings looking to a sale of this lot. It is, beyond successful denial in this case, when all the circumstances come to be considered, especially after sixteen years have passed, and all the principal actors have passed away—Mrs. Johnson, the mother, widow, and administratrix; Mr. Speed, the trustee first acting, and Mr. Mosby, the other trustee, all being dead—that the debtors, or those acting for them, requested this sale, which they not only ratified, but acquiesced in for so many years. The loss which has been incurred of their property was their loss, and they ought to bear it; and the decree of the circuit court placing the loss on the trustees is erroneous and should be reversed and annulled.

"But the decree is also erroneous in ascertaining the measure of damages, if any were incurred by the trustees. The value of the lot constituted no measure of their responsibility. If they sold without authority, they made no valid sale, and the purchaser made no valid purchase; and if they have

received his money without authority they can be only required to pay that back at its scaled value, to be credited by what was realized on it.   But if he paid this to the Johnsons who received it, then the Johnsons owe it to him, and as equity delights to put the saddle on the right horse in the first instance, then the Johnsons should pay it to the purchaser; and we have arrived at the same conclusion by a different route, and the Johnsons may discharge this obligation by paying the debt to Moorman, after crediting the proceeds of the Confederate money, in good money actually received by him on this debt.   But as the decree was made in this case without the personal representation of George T. Johnson being before the court, and without such representation before the court, how can it be justly determined how much in all these years has been paid on this debt by Johnson's administratrix?   And whoever may owe this money to Moorman owes only what is unpaid.

" The personal representative of George T. Johnson, though living at the time of the bringing of the Moorman suit, has never answered, and died before the first term of the court after the suit was brought and before any answers were filed in the cause.   The decree complained of should be reversed and the cause remanded."

On the hearing at this term, it appeared that Mosby's executor had discharged the Moorman debt in full, having paid down in cash in sound currency over $17,000, discharging the said debt—principal, interest, and costs.   But by the decree of the 28th of June, 1888, the said appellant, Mosby's executor, has been required to pay the Johnsons $720 75, that being an *estimated excess* in the value of the lot sold to Solomon Levi over the whole amount of the Moorman debt. Mosby has never had the use of the lot nor the use of the purchase money, but promptly delivered that to the order of Johnson's executrix, acting under the advice of her own counsel, so that the effect of the decrees herein is to allow the

Johnson's to realize on this lot twice—once from Levi and once from Mosby, in full both times; and Moorman has been allowed to speculate upon the estate of an innocent trustee by lending him money which he never borrowed, nor had ever had the use of for a single day for the long period of twenty-seven years; and in all this Mosby was merely a victim. The Johnsons procured the sale for purposes of their own, under the advice of counsel, received the purchase money, a part of which was actually paid to Moorman, and both the trustees, Mosby and Speed, being dead, and Speed insolvent, this astounding result has been achieved. It was erroneous and a great hardship to compel Mosby under the circumstances of this case, to stand between Moorman and the Johnsons as to the Moorman debt. But when the Johnsons received this money in 1862, when not at all depreciated, and insisted on holding it, and refused to give it up, and take back their lot, to compel Mosby's estate to go further, and make the lot good to them a second time, at an estimated price greater than the Moorman debt, I think, is a step which can find no parallel in any case. I, therefore, am constrained to dissent from the opinion of the majority.

DECREE AFFIRMED.